## EASTERN AIRLINES, INC. *v.* FLOYD ET AL.

No. 89–1598.   Argued October 29, 1990—Decided April 17, 1991

MARSHALL, J., delivered the opinion for a unanimous Court.

*John Michael Murray* argued the cause for petitioner. With him on the briefs were *Aurora A. Ares* and *Linda Singer Stein.*

*Joel D. Eaton* argued the cause and filed a brief for respondents.

JUSTICE MARSHALL delivered the opinion of the Court.

Article 17 of the Warsaw Convention[1] sets forth conditions under which an international air carrier can be held lia-

---

[1] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T. S. No. 876

ble for injuries to passengers. This case presents the question whether Article 17 allows recovery for mental or psychic injuries unaccompanied by physical injury or physical manifestation of injury.

I

On May 5, 1983, an Eastern Airlines flight departed from Miami, bound for the Bahamas. Shortly after takeoff, one of the plane's three jet engines lost oil pressure. The flight crew shut down the failing engine and turned the plane around to return to Miami. Soon thereafter, the second and third engines failed due to loss of oil pressure. The plane began losing altitude rapidly, and the passengers were informed that the plane would be ditched in the Atlantic Ocean. Fortunately, after a period of descending flight without power, the crew managed to restart an engine and land the plane safely at Miami International Airport. 872 F. 2d 1462, 1466 (CA11 1989).

Respondents, a group of passengers on the flight, brought separate complaints against petitioner, Eastern Airlines, Inc. (Eastern), each claiming damages solely for mental distress arising out of the incident. The District Court entertained each complaint in a consolidated proceeding.[2] Eastern conceded that the engine failure and subsequent prepreparations for ditching the plane amounted to an "accident" under Article 17 of the Convention but argued that Article 17 also makes physical injury a condition of liability. See *In re Eastern Airlines, Inc., Engine Failure, Miami Int'l Airport*, 629 F. Supp. 307, 312 (SD Fla. 1986). Relying on another federal court's analysis of the French authentic text

---

(1934), note following 49 U. S. C. App. § 1502 (hereinafter Warsaw Convention or Convention).

[2] Each complaint contained two state-law tort claims, a state-law claim for breach of contract, and a claim for recovery under the Warsaw Convention. *In re Eastern Airlines, Inc., Engine Failure, Miami Int'l Airport*, 629 F. Supp. 307, 309 (SD Fla. 1986). The District Court dismissed all claims. *Ibid.* We address only the theory of recovery claimed under the Warsaw Convention.

and negotiating history of the Convention, see *Burnett* v. *Trans World Airlines, Inc.*, 368 F. Supp. 1152 (NM 1973), the District Court concluded that mental anguish alone is not compensable under Article 17. See 629 F. Supp., at 314.

The Court of Appeals for the Eleventh Circuit reversed, holding that the phrase "lésion corporelle" in the authentic French text of Article 17 encompasses purely emotional distress. See 872 F. 2d, at 1480. To support its conclusion, the court examined the French legal meaning of the the term "lésion corporelle," the concurrent and subsequent history of the Convention, and cases interpreting Article 17. See *id.*, at 1471–1480. We granted certiorari, 496 U. S. 904 (1990), to resolve a conflict between the Eleventh Circuit's decision in this case and the New York Court of Appeals' decision in *Rosman* v. *Trans World Airlines, Inc.*, 34 N. Y. 2d 385, 314 N. E. 2d 848 (1974), which held that purely psychic trauma is not compensable under Article 17.[3] We now hold that Article 17 does not allow recovery for purely mental injuries.

II

"When interpreting a treaty, we 'begin "with the text of the treaty and the context in which the written words are used." '" *Volkswagenwerk Aktiengesellschaft* v. *Schlunk*, 486 U. S. 694, 699 (1988), quoting *Société Nationale Industrielle Aérospatiale* v. *United States District Court*, 482

---

[3] Courts of first instance also have disagreed on this issue. Compare *Borham* v. *Pan American World Airways*, 19 Aviation Cases 18,236 (CCH) (SDNY 1986) (purely mental injury covered); and *Karfunkel* v. *Compagnie Nationale Air France*, 427 F. Supp. 971 (SDNY 1977) (same); and *Krystal* v. *British Overseas Airways Corp.*, 403 F. Supp. 1322 (CD Cal. 1975) (same); and *Husserl* v. *Swiss Air Transport Co.*, 388 F. Supp. 1238 (SDNY 1975) *(Husserl II)* (same); and *Palagonia* v. *Trans World Airlines*, 110 Misc. 2d 478, 442 N. Y. S. 2d 670 (Sup. 1978) (same) with *Burnett* v. *Trans World Airlines, Inc.*, 368 F. Supp. 1152 (NM 1973) (excluding purely mental injury); and *Husserl* v. *Swiss Air Transport Co.*, 351 F. Supp. 702 (SDNY 1972) *(Husserl I)*, aff'd, 485 F. 2d 1240 (CA2 1973) (same).

U. S. 522, 534 (1987), quoting *Air France* v. *Saks*, 470 U. S. 392, 397 (1985). Accord, *Chan* v. *Korean Air Lines, Ltd.*, 490 U. S. 122, 134 (1989); *Maximov* v. *United States*, 373 U. S. 49, 53–54 (1963). "Other general rules of construction may be brought to bear on difficult or ambiguous passages." *Volkswagenwerk, supra*, at 700. Moreover, "'treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Saks, supra*, at 396, quoting *Choctaw Nation of Indians* v. *United States*, 318 U. S. 423, 431–432 (1943). Accord, *Volkswagenwerk, supra*, at 700. We proceed to apply these methods in turn.

## A

Because the only authentic text of the Warsaw Convention is in French, the French text must guide our analysis. See *Saks, supra*, at 397–399. The text reads as follows:

> "Le transporteur est responsable du dommage survenu *en cas de mort, de blessure ou de toute autre lésion corporelle* subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de débarquement." 49 Stat. 3005 (emphasis added).

The American translation of this text, employed by the Senate when it ratified the Convention in 1934, reads:

> "The carrier shall be liable for damage sustained *in the event of the death or wounding of a passenger or any other bodily injury* suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018 (emphasis added).

Thus, under Article 17, an air carrier is liable for passenger injury only when three conditions are satisfied: (1) there has

been an accident, in which (2) the passenger suffered "mort," "blessure," "ou . . . toute autre lésion corporelle," and (3) the accident took place on board the aircraft or in the course of operations of embarking or disembarking. As petitioner concedes, the incident here took place on board the aircraft and was an "accident" for purposes of Article 17. See 872 F. 2d, at 1471. Moreover, respondents concede that they suffered neither "mort" nor "blessure" from the mishap.[4] Therefore, the narrow issue presented here is whether, under the proper interpretation of "lésion corporelle," condition (2) is satisfied when a passenger has suffered only a mental or psychic injury.

We must consider the "French legal meaning" of "lésion corporelle" for guidance as to the shared expectations of the parties to the Convention because the Convention was drafted in French by continental jurists. See *Saks, supra,* at 399. Perhaps the simplest method of determining the meaning of a phrase appearing in a foreign legal text would be to consult a bilingual dictionary. Such dictionaries suggest that a proper translation of "lésion corporelle" is "bodily injury." See, *e. g.,* J. Jéraute, Vocabulaire Français-Anglais et Anglais-Français de Termes et Locutions Juridiques 205 (1953) (translating "bodily harm" or "bodily injury" as "lésion ou blessure corporelle"); see also *id.,* at 95 (translating the term "lésion" as "injury, damage, prejudice, wrong"); *id.,* at 41 (giving as one sense of "corporel" the English word "bodily"); 3 Grand Larousse de la Langue Française 1833 (1987) (defining "lésion" as a "[m]odification de la structure d'un tissu vivant sous l'influence d'une cause morbide"). These translations, if correct, clearly suggest that Article 17

---

[4] Courts and commentators agree that "blessure" refers only to "a particular case of physical impact," 872 F. 2d 1462, 1472–1473 (CA11 1989), and thus does not by itself allow recovery for purely psychic harm. See also R. Mankiewicz, The Liability Regime of the International Air Carrier 146 (1981) (hereinafter Mankiewicz). Respondents do not contend that "blessure" has any other meaning.

does *not* permit recovery for purely psychic injuries.[5]  Although we have previously relied on such French dictionaries as a primary method for defining terms in the Warsaw Convention, see *Saks, supra,* at 400, and n. 3, we recognize that dictionary definitions may be too general for purposes of treaty interpretation.   Our concerns are partly allayed when, as here, the dictionary translation accords with the wording used in the "two main translations of the 1929 Convention in English."   Mankiewicz 197.   As we noted earlier, the translation used by the United States Senate when ratifying the Warsaw Convention equated "lésion corporelle" with "bodily injury."   See *supra,* at 535.   The same wording appears in the translation used in the United Kingdom Carriage by Air Act of 1932.   See L. Goldhirsch, The Warsaw Convention Annotated: A Legal Handbook 199, 204 (1988) (hereinafter Goldhirsch).   We turn, then, to French legal materials, *Saks,* 470 U. S., at 400, to determine whether French jurists' contemporary understanding of the term "lésion corporelle" differed from its translated meaning.

In 1929, as in the present day, lawyers trained in French civil law would rely on the following principal sources of French law: (1) legislation, (2) judicial decisions, and (3) scholarly writing.   See generally 1 M. Planiol & G. Ripert, Traité élémentaire de droit civil, pt. 1, Nos. 10, 122, 127 (12th ed. 1939) (Louisiana State Law Inst. trans. 1959); F.

---

[5] There is much agreement even among courts that believe that "lésion corporelle" does provide recovery for such injuries that, if "bodily injury" is the correct translation of "lésion corporelle," Article 17 does not permit recovery for purely psychic injuries.   See, *e. g.,* 872 F. 2d, at 1471 ("While the use of the word *corporelle* would, if read literally, appear to imply that recovery for *dommage mentale* is unavailable, we are persuaded that this literal reading is unwarranted"); *Palagonia* v. *Trans World Airlines, supra,* at 482, 442 N. Y. S. 2d, at 673 (arguing that "[t]he dictionary or literal translation of *lésion corporelle* as 'bodily injury' is not accurate as used in a legal document").   But see, *Husserl II, supra,* at 1250 (arguing that "bodily injury" "can . . . be construed to relate to emotional and mental injury").

Gény, Méthode d'Interprétation et Sources en Droit Privé Positif Nos. 45–50 (2d ed. 1954) (Louisiana State Law Inst. trans. 1963); R. David, French Law: Its Structure, Sources, and Methodology 154 (M. Kindred trans. 1972). Our review of these materials indicates neither that "lésion corporelle" was a widely used legal term in French law nor that the term specifically encompassed psychic injuries.

Turning first to legislation, we find no French legislative provisions in force in 1929 that contained the phrase "lésion corporelle." The principal provision of the French Civil Code relating to the scope of compensable injuries appears to be Article 1382, which provides in very general terms: "Tout fait quelconque de l'homme, qui cause à autrui un dommage, oblige celui par la faute duquel il est . . . arrivé, à le réparer." See 2 Planiol & Ripert, *supra*, at pt. 1, No. 863 (translating Article 1382 as, "Every act whatever of man which causes damage to another obliges him by whose fault it happened to repair it").

Turning next to cases, we likewise discover no French court decisions in or before 1929 that explain the phrase "lésion corporelle," nor do the parties direct us to any. Indeed, we find no French case construing Article 17 of the Warsaw Convention to cover psychic injury. The only reports of French cases we did find that used the term "lésion corporelle" are relatively recent and involve physical injuries caused by automobile accidents and other incidents.[6] These cases tend to support the conclusion that, in French legal usage, the term "lésion corporelle" refers only to physical in-

---

[6] In the several such cases that we found, there was no evidence that French courts would use the term "lésion corporelle" to describe purely psychic injuries. In one case, for example, the highest French court of ordinary jurisdiction, the Cour de Cassation, specifically distinguished "coups et blessures volontaires" ("intentional blows and injuries") sustained by the plaintiff—which the court characterized as "lésions"—from "[les] troubles de nature névrotique" ("neurotic disorders") from which the plaintiff suffered as a result of a prior incident. See *Judgment of November 4, 1971*, Cour de Cassation, 1971 Bull. Civ. II 219, 220.

juries. However, because they were decided well after the drafting of the Warsaw Convention, these cases do not necessarily reflect the contracting parties' understanding of the term "lésion corporelle."

Turning finally to French treatises and scholarly writing covering the period leading up to the Warsaw Convention, we find no materials (and the parties have brought none to our attention) indicating that "lésion corporelle" embraced psychic injury. Subsequent to the adoption of the Warsaw Convention, some scholars have argued that "lésion corporelle" as used in Article 17 should be interpreted to encompass such injury. See, *e. g.*, Mankiewicz 146 (arguing that "in French law the expression *lésion corporelle* covers any 'personal' injury whatsoever"); G. Miller, Liability in International Air Transport 128 (1977) (hereinafter Miller) (arguing that "a liberal interpretation of [Article 17] would be more in line with the spirit of the Convention"). These scholars draw on the fact that, by 1929, France—unlike many other countries, see *infra*, at 544–545, and n. 10—permitted tort recovery for mental distress. See, *e. g.*, 2 Planiol & Ripert, *supra*, at pt. 1, No. 868A (citing cases awarding damages for injury to honor and for loss of affection). However, this *general* proposition of French tort law does not demonstrate that the *specific* phrase chosen by the contracting parties—"lésion corporelle"—covers purely psychic injury.

We find it noteworthy, moreover, that scholars who read "lésion corporelle" as encompassing psychic injury do not base their argument on explanations of this term in French cases or French treatises or even in the French Civil Code; rather, they chiefly rely on the principle of French tort law that any damage can "giv[e] rise to reparation when it is real and has been verified." 2 Planiol & Ripert, *supra*, at pt. 1, No. 868. We do not dispute this principle of French law. However, we have been directed to no French case prior to 1929 that allowed recovery based on that principle for the

type of mental injury claimed here—injury caused by fright or shock—absent an incident in which *someone* sustained physical injury.[7]   Since our task is to "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties," *Saks, supra,* at 399, we find it unlikely that those parties' apparent understanding of the term "lésion corporelle" as "bodily injury" would have been displaced by a meaning abstracted from the French law of damages.   Particularly is this so when the cause of action for psychic injury that evidently was possible under French law in 1929 would not have been recognized in many other countries represented at the Warsaw Convention.   See *infra,* at 544–545, and n. 10.

Nor is this conclusion altered by our examination of Article 17's structure.   In the decision below, the Court of Appeals found that the Article's wording "suggests that the drafters did not intend to exclude any particular category of damages," because if they had intended "to refer only to injury caused by physical impact," they "would not have singled out

---

[7] Of the two cases cited by Mankiewicz to demonstrate that French law did compensate mental injuries, one involved recovery by a stepdaughter for emotional distress resulting from the death of her stepmother and the other involved recovery for injury to honor arising from adultery.   See Mankiewicz 145 (citing decisions of the highest French court in 1923 and 1857).   See also 11 International Encyclopedia of Comparative Law: Torts ch. 9, § 9–39, pp. 16–17, and nn. 114–115 (A. Tunc ed. 1972) (citing, as the first personal injury cases permitting recovery for nonpecuniary damages, an 1833 French decision in which "counsel for the plaintiff took as an illustration of *dommage moral* for which recovery should be permitted the grief of a family upon the death of one of their members" and an 1881 Belgian decision in a wrongful death case).   Whether the "shared expectation" of the Warsaw Convention parties was that the distress experienced by relatives of injured or dead airline passengers qualified under Article 17 as *"dommage survenu* en cas de mort, [ou] de blessure . . . subie par un voyageur" (*"damage sustained* in the event of the death or wounding of a passenger")* is a different question from whether psychic injury actually suffered by a passenger is encompassed by the term "lésion corporelle."

and specifically referred to a particular case of physical impact such as *blessure* ('wounding')." 872 F. 2d, at 1472–1473 (citing Mankiewicz 146). This argument, which has much the same force as the surplusage canon of domestic statutory construction, is plausible. Cf. *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979). Yet one might draw a contrary inference from the same language. As noted, one meaning of "lésion" is a change in the structure of an organ due to injury or disease. See *supra*, at 536, citing 3 Grand Larousse de la Langue Française 1833 (1987). If "blessure" refers to injuries causing visible ruptures in the body (a common meaning of a "wounding"), "lésion corporelle" might well refer to a more general category of physical injuries that includes internal injuries caused, for example, by physical impact, smoke or exhaust inhalation, or oxygen deprivation. Admittedly, this inference still runs afoul of the Court of Appeals' surplusage argument. However, because none of the other sources of French legal meaning noted above support the Court of Appeals' construction, we are reluctant to give this argument dispositive weight.

The same structural argument offered by the Court of Appeals was advanced by one of the German delegates to the Warsaw Convention. See *Palagonia* v. *Trans World Airlines*, 110 Misc. 2d 478, 483, 442 N. Y. S. 2d 670, 673–674 (Sup. 1978) (quoting testimony of Otto Riese). Accordingly, the official German translation of "lésion corporelle" adopted by Austria, Germany, and Switzerland uses German terms whose closest English translation is apparently "infringement on the health." See Mankiewicz 146. We are reluctant, however, to place much weight on an English translation of a German translation of a French text, particularly when we have been unable to find (and the parties have not cited) any German, Austrian, or Swiss cases adhering to the broad interpretation of Article 17 that the German delegate evidently espoused.

In sum, neither the Warsaw Convention itself nor any of the applicable French legal sources demonstrates that "lésion corporelle" should be translated other than as "bodily injury"—a narrow meaning excluding purely mental injuries. However, because a broader interpretation of "lésion corporelle" reaching purely mental injuries is plausible, and the term is both ambiguous and difficult, see *supra*, at 535, we turn to additional aids to construction.[8]

## B

Translating "lésion corporelle" as "bodily injury" is consistent, we think, with the negotiating history of the Convention. "The treaty that became the Warsaw Convention was first drafted at an international conference in Paris in 1925." *Air France* v. *Saks*, 470 U. S., at 401; see also *Chan* v. *Korean Air Lines, Ltd.*, 490 U. S., at 139 (Brennan, J., concurring in judgment). See generally [1925 Paris] Conférence Internationale de Droit Privé Aérien (1936) (hereinafter Paris Conference). The final protocol of the Paris Conference contained an article specifying that: "'The carrier is liable for accidents, losses, breakdowns, and delays. It is not liable if it can prove that it has taken reasonable measures designed to pre-empt damage . . . .'" *Saks, supra,* at 401, translating Article 5 of the protocol, Paris Conference 87. It appears that "[t]his expansive provision, broadly holding carriers liable in the event of an accident, would almost certainly have permitted recovery for all types of injuries, including emotional distress." Sisk, Recovery for Emotional Distress Under the Warsaw Convention: The Elusive Search for the French Legal Meaning of *Lésion Corporelle*, 25 Texas Int'l L. J. 127, 142 (1990), citing Miller 124.

The Paris Conference appointed a committee of experts, the Comité International Technique d'Experts Juridiques Aériens (CITEJA), to revise its final protocol for presenta-

---

[8] We will refer to these alternative interpretations of "lésion corporelle" as the "narrow" and "broad" readings of the term.

tion to the Warsaw Conference. See *Chan, supra,* at 139 (Brennan, J., concurring in judgment); *Saks, supra,* at 401. The CITEJA draft split the liability article of the Paris Conference's protocol into three provisions with one addressing damages for injury to passengers, the second addressing injury to goods, and the third addressing losses caused by delay. The CITEJA subsection on injury to passengers introduced the phrase "en cas de mort, de blessure ou de toute autre lésion corporelle." [Deuxième] Conférence Internationale de Droit Privé Aérien, 4–12 Octobre 171–172 (1929) (Article 21, subsection (a) of the CITEJA draft). This language was retained in Article 17 ultimately adopted by the Warsaw Conference. See 49 Stat. 3005. Although there is no definitive evidence explaining why the CITEJA drafters chose this narrower language, we believe it is reasonable to infer that the Conference adopted the narrower language to limit the types of recoverable injuries. Cf. *Volkswagenwerk Aktiengesellschaft* v. *Schlunk,* 486 U. S., at 700–701 (noting significance of change in negotiating history of Hague Service Convention from less precise term in draft to more precise term in final treaty provision).[9]

_____

[9] Courts and commentators, including the Court of Appeals, have cited the doctoral thesis of a French scholar, Yvonne Blanc-Dannery, as extrinsic evidence of the Warsaw parties' intent. See, *e. g.,* 872 F. 2d, at 1472; *Palagonia,* 110 Misc. 2d, at 482, 442 N. Y. S. 2d, at 673; Mankiewicz 146. According to Mankiewicz, the Blanc-Dannery thesis was written under the supervision of Georges Ripert. Mankiewicz 146, citing Blanc-Dannery, La Convention de Varsovie et les Régles du Transport Aérien International (1933) (hereinafter Blanc-Dannery). Georges Ripert was a leading French delegate at the Warsaw Convention and an expert of the French Government at the CITEJA proceedings. Minutes, Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw 6 (R. Horner & D. Legrez trans. 1975) (hereinafter Minutes). Mankiewicz translates a passage from the Blanc-Dannery thesis as follows: " 'The use of the expression *lésion* after the words 'death' and 'wounding' encompasses and contemplates cases of traumatism and nervous troubles, the consequences of which do not immediately become manifest in the organism but which can be related to the accident.' " Mankiewicz 146. Eastern offers persua-

Our review of the documentary record for the Warsaw Conference confirms — and courts and commentators appear universally to agree — that there is no evidence that the drafters or signatories of the Warsaw Convention specifically considered liability for psychic injury or the meaning of "lésion corporelle." See generally Minutes. Two explanations commonly are offered for why the subject of mental injuries never arose during the Convention proceedings: (1) many jurisdictions did not recognize recovery for mental injury at that time, or (2) the drafters simply could not contemplate a psychic injury unaccompanied by a physical injury. See, e. g., Husserl v. Swiss Air Transport Co., 388 F. Supp. 1238, 1249 (SDNY 1975) (Husserl II); Cie Air France v. Teichner, 39 Revue Française de Droit Aérien 232, 242, 23 Eur. Tr. L. 87, 101 (Israel 1984); Mankiewicz 144–145; Miller 123–125. Indeed, the unavailability of compensation for purely psychic injury in many common and civil law countries at the time of the Warsaw Conference[10] persuades us that the signatories

sive evidence that Mankiewicz's translation may be overbroad. See Reply Brief for Petitioner 2 (noting that the French word "perturbations" should be translated to connote a disturbance or aberration in a bodily organ or function rather than mere traumatisms or nervous troubles). Even if Mankiewicz's translation is accurate, however, Blanc-Dannery's asserted definition is not supported by evidence from the CITEJA or Warsaw proceedings. See Blanc-Dannery 62. In the absence of such support we find the Blanc-Dannery thesis to have little or no value as evidence of the drafters' intent.

[10] Although French law recognized recovery for certain types of mental distress long before the Convention was drafted, see Mankiewicz 145, in common-law jurisdictions mental distress generally was excluded from recovery in 1929. See Miller 113. Such recovery was not definitively recognized in the United Kingdom until the early 1940's. See Mankiewicz 145; J. Fleming, Law of Torts 49 (1985) (hereinafter Fleming). American courts insisted on a physical impact rule long after English courts abandoned the practice. See ibid.; W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 54, p. 363 (5th ed. 1984). In the State of New York, where many Warsaw Convention cases have been litigated, recovery for purely mental injury was not recognized until 1961. See Mankiewicz 145, citing Battalla v. State, 10 N. Y. 2d 237, 176 N. E. 2d

had no specific intent to include such a remedy in the Convention. Because such a remedy was unknown in many, if not most, jurisdictions in 1929, the drafters most likely would have felt compelled to make an unequivocal reference to purely mental injury if they had specifically intended to allow such recovery.

In this sense, we find it significant that, when the parties to a different international transport treaty wanted to make it clear that rail passengers could recover for purely psychic harms, the drafters made a specific modification to this effect. The liability provision of the Berne Convention on International Rail, drafted in 1952, originally conditioned liability on "la mort, les blessures et toute autre atteinte, à l'intégrité corporelle." International Convention Concerning the Carriage of Passengers and Luggage By Rail, Berne, Oct. 25, 1952, 242 U. N. T. S. 355, Article 28, p. 390. The drafters subsequently modified this provision to read "l'intégrité physique *ou mentale*." See Additional Convention to the International Convention Concerning the Carriage of Passengers and Luggage by Rail (CIV) of Feb. 25, 1961, Relating to the Liability of the Railway for Death of and Personal Injury to Passengers, done Feb. 26, 1966, Art. 2, reprinted in Transport: International Transport Treaties V–

---

729 (1961); see also Miller 113–115 (noting the post-1929 liberalization of rules for tort recovery in the United Kingdom and the United States). Several of the civil law and socialist signatories to the Warsaw Convention were slow to recognize recovery for nonpecuniary losses such as pain and suffering, grief caused by the death of a relative, or mental distress. See 11 International Encyclopedia of Comparative Law: Torts, Ch. 9, §§ 9-39, 9-40. The Netherlands, for example, did not permit nonpecuniary damages until 1943, and the German and Swiss Civil Codes generally barred nonpecuniary damages, though with certain exceptions — including an exception for cases of personal injury. See *id.*, at § 9-41. In addition, the Soviet Union, another original signatory, has never recognized compensation for nonpecuniary loss. *Id.*, at § 9-37. In countries barring recovery for nonpecuniary losses, recovery for mental injuries might have been available where financial loss could be shown, however, we are not aware of any such cases.

52 (Kluwer Publishers) (Supp. 1–10, Jan. 1986) (emphasis added).

The narrower reading of "lésion corporelle" also is consistent with the primary purpose of the contracting parties to the Convention: limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry. See *Trans World Airlines, Inc.* v. *Franklin Mint Corp.*, 466 U. S. 243, 256 (1984); Minutes 37; Lowenfeld & Mendelsohn, The United States and The Warsaw Convention, 80 Harv. L. Rev. 497, 498–499 (1967) (hereinafter Lowenfeld & Mendelsohn). Indeed, it was for this reason that the Warsaw delegates imposed a maximum recovery of $8,300 for an accident—a low amount even by 1929 standards. See Lowenfeld & Mendelsohn 498–499.[11] Whatever may be the current view among Convention signatories, in 1929 the parties were more concerned with protecting air carriers and fostering a new industry than providing full recovery to injured passengers, and we read "lésion corporelle" in a way that respects that legislative choice.

## C

We also conclude that, on balance, the evidence of the post-1929 "conduct" and "interpretations of the signatories," *Saks*, 470 U. S., at 403, supports the narrow translation of "lésion corporelle."

In the years following adoption of the Convention, some scholars questioned whether Article 17 extended to mental or emotional injury. See, *e. g.*, Beaumont, Need for Revision and Amplification of the Warsaw Convention, 16 J. Air L. & Com. 395, 402 (1949); R. Coquoz, Le Droit Privé International Aérien 122 (1938); Sullivan, The Codification of Air Carrier Liability by International Convention, 7 J. Air L. 1, 19 (1936). In 1951, a committee composed of 20 Warsaw

---

[11] The second goal of the Convention was to establish uniform rules governing documentation such as airline tickets and waybills and uniform procedure for addressing claims arising out of international transportation. See Minutes 85, 87; Lowenfeld & Mendelsohn 499. Our construction of "lésion corporelle" also is consistent with that goal. See *infra*, at 552.

Convention signatories met in Madrid and adopted a proposal to substitute "affection corporelle" for "lésion corporelle" in Article 17. See International Civil Aviation Organization Legal Committee, Minutes and Documents of the Eighth Session, Madrid, ICAO Doc. 7229–LC/133, pp. xiii, 137 (1951). The French delegate to the committee proposed this substitution because, in his view, the word "lésion" was too narrow, in that it "presupposed a rupture in the tissue, or a dissolution of continuity" which might not cover an injury such as mental illness or lung congestion caused by a breakdown in the heating apparatus of the aircraft. See *id.*, at 136. The United States delegate opposed this change if it "implied the inclusion of mental injury or emotional disturbances or upsets which were not connected with or the result of bodily injury," see *id.*, at 137, but the committee adopted it nonetheless, see *ibid.* Although the committee's proposed amendment was never subsequently implemented, its discussion and vote in Madrid suggest that, in the view of the 20 signatories on the committee, "lésion corporelle" in Article 17 had a distinctly physical scope.

In finding that the signatories' post-1929 conduct supports the broader interpretation of "lésion corporelle," the Court of Appeals relied on three international agreements: The Hague Protocol of 1955, The Montreal Agreement of 1966, and the Guatemala City Protocol of 1971. See 872 F. 2d, at 1474–1475. For each of these agreements, the Court of Appeals emphasized that English translations rendered "lésion corporelle" as "personal injury," instead of "bodily injury." In our view, none of these agreements support the broad interpretation of "lésion corporelle" reached by the Court of Appeals.

The Hague Protocol amended Article 3 of the Warsaw Convention,[12] which sets forth the particular information a pas-

---

[12] The Hague Protocol also amended the Convention to double the limit of liability for accidents to $16,600. See Hague Protocol Article XI, reprinted in Goldhirsch 268–269; Lowenfeld & Mendelsohn 507–509.

At the Hague Conference, the signatories were presented with a proposal to amend Article 17 to cover purely mental injuries. The Greek

senger's ticket must contain, to require notice of the limitation upon the carrier's liability for passenger injuries under the Convention. See Hague Protocol Article III, reprinted in Goldhirsch 266. While the authentic French version of Article 3 retained the phrase "lésion corporelle," the authentic *English* version of the Hague Protocol, which was proposed by the United States delegation, used the phrase "personal injury." See 2 International Civil Aviation Organization, International Conference on Private Air Law, The Hague, Sept. 1955, ICAO Doc. 7686–LC/140, p. 243 (proposal of the United States); see also Goldhirsch 266 (citing final version of Hague Protocol).[13] Citing *Saks*, the Court of Appeals treated the Hague Protocol's use of "personal injury" as a " 'subsequent interpretatio[n] of the signatories' " that "helps clarify the meaning" of "lésion corporelle." See 872 F. 2d, at 1474–1475. However, we do not accept the argument that the Hague Protocol signatories intended "personal injury" to be an interpretive translation of "lésion corporelle" where there is no evidence that they intended the authentic English text to effect a substantive change in, or

---

delegation proposed adding the word "mental" to Article 17 because it was "not clear" whether Article 17 allowed recovery for such injury. See 1 International Civil Aviation Organization, International Conference on Private Air Law, The Hague, Sept. 1955, ICAO Doc. 7686–LC/140, p. 261. No one seconded this proposal. *Ibid.* In the absence of further discussion by the delegates, we cannot infer much from that fact.

[13] According to the English text of the final version, passenger tickets must contain

"a notice to the effect that, if the passenger's journey involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention may be applicable and that the Convention governs and in most cases limits the liability of carriers *for death or personal injury* and in respect of loss of or damage to baggage." Goldhirsch 266 (emphasis added).

The French version of the text emphasized above reads: "en cas de mort ou de lésion corporelle." *Id.*, at 256.

clarification of that term.  Moreover, the portion of Article 3 of the Hague Protocol in which "personal injury" appears is concerned solely with informing passengers that when the convention "governs" it "in most cases limits the liability of carriers for death or personal injury."  See *supra*, n. 13.  It may be, therefore, that the signatories used "personal injury" not as an interpretive translation of "lésion corporelle" but merely as a way of giving a summary description of the limitations of liability imposed by the Convention.

The Montreal Agreement of 1966 is similarly inconclusive. The Agreement, which affects only international flights with connecting points in the United States, raised the limit of accident liability to $75,000 and waived due-care defenses.  See Montreal Agreement, reprinted in Goldhirsch 317–318; Lowenfeld & Mendelsohn 596–597.  The Court of Appeals noted that, under the Montreal Agreement, the notice appearing on passenger tickets used the term "personal injury" rather than "bodily injury" and that the United States Civil Aeronautics Board used these terms interchangeably in approving the Agreement.  872 F. 2d, at 1474. For two reasons, we do not believe that this evidence bears on the signatories' understanding of "lésion corporelle" in Article 17.  First, as the Court of Appeals acknowledged, "[t]he Montreal Agreement is not a treaty, but rather an agreement among all major international air carriers that imposes a quasi-legal and largely experimental system of liability essentially contractual in nature."  *Id.*, at 1468–1469. Therefore, the Montreal Agreement does not and cannot purport to speak for the signatories to the Warsaw Convention. Second, the Montreal Agreement does not purport to change or clarify the provisions of Article 17.

We likewise do not believe that the Guatemala City Protocol of 1971 sheds any light upon the intended scope of Article 17.  The Protocol was drafted in three authentic texts, English, French, and Spanish, but the French text was to control

in cases of conflict. See Guatemala City Protocol Article XXVI, reprinted in Goldhirsch 329. The Protocol amended the French text of Article 17 by deleting the word "blessure," while retaining "lésion corporelle." See 2 International Civil Aviation Organization, International Conference on Air Law, Guatemala City, ICAO Doc. 9040–LC/167–2, p. 183 (1972). Additionally, the English text of the Protocol substituted "personal injury" for "wounding or other bodily injury" in Article 17. See Guatemala City Protocol Article IV, reprinted in Goldhirsch 320–321. The Court of Appeals read the changes in both the French and English versions of Article 17 as supporting an interpretation of "lésion corporelle" broader than "bodily injury." See 872 F. 2d, at 1475.

For several reasons, however, we disagree. First, there is no evidence that the changes to the English or French text were intended to effect a substantive change or clarification. Cf. Miller 123 (noting that the change to the English text was inconspicuously proposed by a drafting group of the ICAO Legal Committee as a minor drafting improvement). Neither mental injuries nor the minor drafting changes were discussed at the Guatemala City Conference. See 1 International Civil Aviation Organization, International Conference on Air Law, Minutes, Guatemala City, ICAO Doc. 9040–LC/167–1, pp. 31–38, 41–63 (1972). Second, of the approximately 120 signatories to the Warsaw Convention, only a few countries have actually ratified the Guatemala City Protocol, see Mankiewicz 237, and therefore the Protocol is not in effect in the international arena. Likewise, we have stated that because the United States Senate has not ratified the Protocol we should not consider it to be dispositive. See *Saks, supra,* at 403.

We must also consult the opinions of our sister signatories in searching for the meaning of a "lésion corporelle." See *Saks,* 470 U. S., at 404. The only apparent judicial decision from a sister signatory addressing recovery for purely mental injuries under Article 17 is that of the Supreme Court of

Israel. That court held that Article 17 does allow recovery for purely psychic injuries. See *Cie Air France* v. *Teichner*, 39 Revue Française de Droit Aérien, at 243, 23 Eur. Tr. L., at 102.[14]

*Teichner* arose from the hijacking in 1976 of an Air France flight to Entebbe, Uganda. Passengers sought compensation for psychic injuries caused by the ordeal of the hijacking and detention at the Entebbe Airport. While acknowledging that the negotiating history of the Warsaw Convention was silent as to the availability of such compensation, *id.*, at 242, 23 Eur. Tr. L., at 101, the court determined that "desirable jurisprudential policy" ("la politique jurisprudentielle souhaitable") favored an expansive reading of Article 17 to reach purely psychic injuries. *Id.*, at 243, 23 Eur. Tr. L., at 102. In reaching this conclusion, the court emphasized the post-1929 development of the aviation industry and the evolution of Anglo-American and Israeli law to allow recovery for psychic injury in certain circumstances. *Ibid.*, 23 Eur. Tr. L., at 101–102. In addition, the court followed the view of Miller that this expansive construction was desirable to avoid an apparent conflict between the French and English versions of the Guatemala City Protocol. *Id.*, at 243–244, 23 Eur. Tr. L., at 102, citing Miller 128–129.

Although we recognize the deference owed to the Israeli court's interpretation of Article 17, see *Saks, supra*, at 404, we are not persuaded by that court's reasoning. Even if we were to agree that allowing recovery for purely psychic injury is desirable as a policy goal, we cannot give effect to such policy without convincing evidence that the signatories' intent with respect to Article 17 would allow such recovery. As discussed, neither the language, negotiating history, nor postenactment interpretations of Article 17 clearly evidences such intent. Nor does the Guatemala City Protocol support the Israeli court's conclusion because nothing in the Protocol

---

[14] In the only published versions that we could find, the Israeli opinion is reported in French.

purports to amend Article 17 to reach mental injuries. Moreover, although the Protocol reflects a liberalization of attitudes toward passenger recovery in that it provides for strict liability, see Article IV, reprinted in Goldhirsch 320, the fact that the Guatemala City Protocol is still not in effect after almost 20 years since it was drafted should caution *against* attaching significance to it.

Moreover, we believe our construction of Article 17 better accords with the Warsaw Convention's stated purpose of achieving uniformity of rules governing claims arising from international air transportation. See n. 11, *supra*. As noted, the Montreal Agreement subjects international carriers to strict liability for Article 17 injuries sustained on flights connected with the United States. See *supra*, at 549. Recovery for mental distress traditionally has been subject to a high degree of proof, both in this country and others. See Prosser and Keeton on Torts, at 60–65, 359–361 (American courts require extreme and outrageous conduct by the tortfeasor); Fleming 49–50 (British courts limit such recovery through the theory of foreseeabilty); Miller 114, 126 (French courts require proof of fault and proof that damage is direct and certain). We have no doubt that subjecting international air carriers to *strict* liability for purely mental distress would be controversial for most signatory countries. Our construction avoids this potential source of divergence.

### III

We conclude that an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury. Although Article 17 renders air carriers liable for "damage sustained in the event of" ("dommage survenu en cas de") such injuries, see 49 Stat. 3005, 3018, we express no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries. That issue is

not presented here because respondents do not allege physical injury or physical manifestation of injury.   See App. 3–9.

Eastern urges us to hold that the Warsaw Convention provides the exclusive cause of action for injuries sustained during international air transportation.   The Court of Appeals did not address this question, and we did not grant certiorari to consider it.   We therefore decline to reach it here.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*