**In the Matter of the Requested EXTRADITION of James Joseph SMYTH.**

**No. CR 92–152 MISC BAC.**

United States District Court, N.D. California.

May 6, 1993.

Mark N. Zanides, Asst. U.S. Atty., San Francisco, CA, for plaintiff.

Karen Snell, Asst. Federal Public Defender, San Francisco, CA, for defendant.

ORDER

CAULFIELD, District Judge.

On September 14, 1992, the United Kingdom filed a formal request for the extradition of James Joseph Smyth to serve the remainder of his sentence for a 1978 conviction in Belfast, Northern Ireland.[1] Smyth has indi-

---

1. The underlying facts of this case are fully set forth in this court's written decision regarding defendant's request for bail and need not be restated here. *See United States v. James Joseph*

cated that he will raise a defense to extradition pursuant to Article 3(a) of the Supplemental Extradition Treaty between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland, which went into effect on December 23, 1986 ("Supplemental Treaty").

As of this date, no United States court has addressed the issue of whether Article 3(a) may prevent the extradition of an alleged IRA fugitive to Northern Ireland. Article 3(a) has been addressed in only three published opinions besides the two in this matter.[2] Commentators and courts addressing the interpretation of Article 3(a) have noted the contradictory interpretations the provision invokes. In an attempt to clarify the scope of Smyth's extradition hearing, the court requested briefs addressing the issues and evidentiary proffers under Article 3(a). The purpose of this order is to outline the court's rulings regarding the permissible scope of evidence to be introduced during trial.

### A. The Supplemental Treaty

The Supplemental Treaty was proposed by President Reagan in an attempt to address the growing tide of international terrorism by excluding from the scope of the political offense exception certain violent offenses typically committed by terrorists.[3] Article 1 of the Supplemental Treaty was designed to eliminate the political offense exception for individuals accused of one of the enumerated offenses. *McMullen v. United States*, 953 F.2d at 761. The Reagan Administration's goals in submitting the Supplemental Treaty are reflected in Article 1, which reads:

(1) Amend article 1 to read as follows:

"For the purpose of the Extradition Treaty, none of the following shall be regarded as an offense of a political character:

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, voluntary manslaughter, and assault causing grievous bodily harm;

(c) kidnapping, abduction, or serious unlawful detention, including taking a hostage;

(d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person; and

(e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense."

It is undisputed that Smyth's conviction for attempted murder of a prison guard precludes him from asserting the "political offense" defense to a request for extradition. Mr. Smyth nonetheless attempts to avoid extradition by asserting Article 3(a) of the Supplemental Treaty, which provides:

Notwithstanding any other provision of this Supplemental Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his

---

*Smyth*, 795 F.Supp. 973 (N.D.Cal 1992), *rev'd on other grounds sub nom.*, *In re Extradition of Smyth*, 976 F.2d 1535 (1992).

**2.** (1) *In re Extradition of McMullen*, 769 F.Supp. 1278 (S.D.N.Y.1991), *aff'd in part and rev'd in part sub nom*, *In the Matter of the Request for Extradition of McMullen v. U.S. Court of Appeals, Second Circuit*, 989 F.2d 603 (2d Cir.1993) (en banc); (2) *McMullen v. United States*, 953 F.2d 761 (2d Cir.1992); and (3) *In re Extradition of Howard*, 791 F.Supp. 31 (D.Mass.1992).

**3.** *See President's Letter of Transmittal to the U.S. Senate*, 131 CONG.REC. S 9696. The Supplemental Treaty was prepared to eliminate the "political exception" to extradition in cases involving Great Britain. Specifically, the Supplemental Treaty was designed to reverse cases in which the district court refused a request for extradition of purported terrorists from Northern Ireland, and stem the developments in U.S. Courts to deny extradition under the "political offense" exception. *See, In re Extradition of McMullen*, 769 F.Supp. at 1285–87.

trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions. Commentators and at least one court have noted that Article 3(a) contains two distinct concepts:

1) the courts may inquire into whether the requesting state has "trumped up" charges against the fugitive (referred to as the "Ninoy Aquino" clause); and

2) the courts may inquire into whether the fugitive would be unfairly treated at his trial [or punished or restricted in his liberty] because of his race, religion, nationality, or political opinions.

*United States v. Howard,* No. 91–04682–01, 1991 WL 246302 (D.Mass.1991).

Mr. Smyth does not contend that the "Ninoy Aquino" clause of Article 3(a) applies. He relies instead on the second clause of Article 3(a), which provides that extradition shall not be granted if it is requested with an eye towards discriminating against him in his trial or subsequent punishment. In support of this defense, Mr. Smyth has indicated that he intends to proffer the following evidence:

[t]hat the system of justice in Northern Ireland is fundamentally unfair, proof which alone will defeat extradition. He will then demonstrate the specific ways that he personally suffered from the prejudice inherent in that system, and will continue to suffer if returned. Among the ways was the fact that he was the victim of discriminatory detentions; that he was tried in a non-jury Diplock court reserved for those charged with "scheduled" offenses; that he was prejudiced in his conditions of punishment because of his political and religious beliefs; and that if returned he would be discriminated against in his punishment; and that, due to his status as a Catholic, a nationalist, an ex-prisoner and a member of Sinn Fein, he would be restricted in his liberty.

*Smyth's Brief re: Scope of Extradition Hearing,* at 9:23–10:8.

B. *Interpretation of Article 3(a)*

■ This court's initial inquiry in interpreting Article 3(a) is the "text of the treaty and the context in which the written words are used." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 2107–08, 100 L.Ed.2d 722 (1988); *Eastern Airlines, Inc. v. Floyd,* —— U.S. ——, ——, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991). "Other general rules of construction may be brought to bear on difficult or ambiguous passages." *Volkswagenwerk, supra,* 486 U.S. at 700, 108 S.Ct. at 2108.

The crux of the dispute between Smyth and the U.S. government regarding the interpretation of Article 3(a) is the extent to which Article 3(a) invites this court to examine the criminal justice system of Northern Ireland. Specifically, does Article 3(a) authorize this court to examine the fundamental fairness of the Diplock court system, or is this court's inquiry limited to alleged past or future discriminatory treatment Mr. Smyth himself has received or will receive in the system?

■ Smyth interprets Article 3(a) as eliminating the traditional rule of non-inquiry in extradition cases. The rule of non-inquiry precludes the introduction of evidence regarding the alleged overall unfairness of the requesting country's judicial system. This traditional rule of non-inquiry "presumes that countries with which the United States has entered into extradition treaties will treat those extraditions under the treaty fairly." *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).

■ While the court may look to the history of the treaty when interpreting its provisions, *Eastern Airlines, supra,* —— U.S. at ——, 111 S.Ct. at 1493, the starting point of the court's inquiry is the text of the treaty provision. Article 3(a) clearly created an exception to the traditional rule of non-inquiry; however, nothing in the express language of Article 3(a) supports Smyth's interpretation insofar as he maintains that Article 3(a) nullifies the traditional rule of non-inquiry. The court views the exception as a limited one that grants to the person being sought the right to establish that he himself would be prejudiced as a result of discriminatory treatment within the requesting country's criminal justice system. This inquiry is individual and case specific. The discriminatory

treatment must be personal to the individual opposing extradition.

Senators Kerry, Biden and Eagleton made extensive comments regarding the interpretation of Article 3(a). Senators Kerry and Biden appear to view Article 3(a) as expanding the role of inquiry of the United States courts into the fairness of the requesting court's judicial systems. Senator Eagleton, the principle drafter of Article 3(a), emphasized, however, that "Article 3(a) is not intended to give courts authority generally to critique the abstract fairness of the foreign judicial systems." 132 Cong.Rec. 16,607.

■ Both the plain language of the provision and the historical background of the Treaty weigh against Mr. Smyth's expansive interpretation of Article 3(a). The Supplemental Treaty was negotiated and ratified in order to facilitate the extradition of persons committing terrorist violence in Northern Ireland. At the time the Supplemental Treaty was negotiated, there was considerable concern about the implementation of justice in the Diplock courts. Congress eliminated the political exception to extradition for specific categories of terrorist activities in Article 1 of the treaty. Article 3(a) must be interpreted in a manner consistent with the structure of the Supplemental Treaty. It is therefore reasonable and logical to infer that Congress did not intend to abandon the traditional rule of non-inquiry with respect to the United Kingdom and the Diplock courts through Article 3(a). Article 3(a) gives the person sought an opportunity to show by a preponderance of the evidence that he as an individual would suffer discrimination in the trial, or in the implementation of punishment, on account of race, religion, national origin or political views, and thus answers the Senate's concern about completely eliminating the political exception to extradition.

### C. Specific Evidentiary Considerations

The court rules as follows on specific proffers of evidence by the parties:

#### 1. Evidence Relating to Pre-Arrest Activities

■ Mr. Smyth has indicated that he intends to introduce evidence of alleged pre-

arrest maltreatment he received at the hands of the "security force" prior to his arrest for the attempted murder of Mr. Carlisle. The government objects to the introduction of such evidence as irrelevant to the issues of Mr. Smyth's treatment during his trial and subsequent internment in the Maze. The court views such evidence as relevant background evidence which may tend to show a pattern of discriminatory treatment aimed specifically at Mr. Smyth. Accordingly, such evidence will be admissible.

#### 2. Alleged Unfairness of the Diplock Court System

■ Mr. Smyth will not be allowed to introduce evidence regarding the alleged general unfairness of the Diplock Court System. This case differs from most extradition proceedings in that Mr. Smyth has already been convicted in the courts of the requesting country. The United Kingdom seeks Mr. Smyth's extradition so that he may complete the prison term he was serving when he escaped from the Maze prison. While Mr. Smyth is precluded from challenging the general fairness of the Diplock system, he may, nonetheless, present evidence regarding irregularities in his specific trial under the Diplock system upon a showing that the irregularities resulted from discrimination on the bases of religion, nationality or political views.

Mr. Smyth has taken issue with the following statement in the government's opening brief regarding the scope issues:

> We agree that Article 3(a) entitles Smyth to attempt to meet his burden by proving particular occurrences of religious or political discrimination that caused him actual prejudice related to this extradition request. *That is, we agree that he is entitled to attempt to show that religious or political discrimination resulted in a conviction that, but for that impermissible discrimination, would not have occurred.*

*Memorandum of the United Kingdom Regarding the Scope of Extradition Hearing,* at 4:3–9 (emphasis added).

Article 3(a) does not support the government's characterization of Mr. Smyth's bur-

den in this matter. Article 3(a) provides that extradition will not be granted if the person sought establishes that he will be prejudiced in his trial or punishment. There is no "but for" or "harmless error" provision anywhere in the Supplemental Treaty, nor does Article 3(a) speak to the guilt or innocence of the person sought. Article 3(a) simply addresses the potential prejudice that a person may face if extradited. The extradition hearing will not be a retrial of Mr. Smyth's alleged guilt, nor will the proceeding be conducted as an appeal of the Diplock Court trial. Mr. Smyth maintains that he would be prejudiced in his treatment if returned to Northern Ireland. Evidence regarding his trial in the Diplock Court is admissible solely to provide factual support for his claim of prejudice.

### 3. *Conditions of Confinement: Past and Future*

The parties are in agreement that evidence regarding Mr. Smyth's conditions of confinement is admissible. However, such evidence must tend to show that any poor treatment suffered is a result of discrimination on the bases of race, religion, nationality or political views.

### 4. *Restraints on Liberty/Risk of Assassination*

Evidence that Mr. Smyth himself would be subject to restraints on his liberty upon release from the Maze, or at risk of assassination is not admissible absent a showing that the government has explicitly tolerated or has been materially involved in any plots to restrain his liberty or assassinate him. Evidence that individuals who had previously served time in the Maze were restrained in their personal liberty or assassinated upon their release will not be admissible absent some showing of a pattern of conduct involving a government entity. For example, the court would consider the introduction of such evidence upon a showing under F.R.E. 104 that individuals who had religious or political views substantially similar to Smyth, and who had been convicted of either murder or attempted murder of "security" personnel (prison guards, security forces, etc.) were disproportionately restricted in their liberty or assassinated upon their release from the Maze and that a govern-ment entity was involved in the action directly or indirectly.