Joyce E. COYLE, as Personal Representative of the Estate of Fritz G. Baden, Deceased, and as Personal Representative of the Estate of Djoeminah Baden, Deceased, Plaintiff,

v.

P.T. GARUDA INDONESIA, an Indonesia Corporation, dba Garuda Indonesia Airlines, Defendant.

No. CIV.99–1348–JE.

United States District Court, D. Oregon.

June 27, 2001.

U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Defendant has timely filed objections. I have, therefore, given *de novo* review of Magistrate Judge Jelderks' rulings.

I find no error. Accordingly, I ADOPT Magistrate Judge Jelderks' Findings and Recommendation dated April 30, 2001, in its entirety. Defendant's motion (# 16) to dismiss, or in the alternative for summary judgment, is DENIED. This matter is to be set for trial in Oregon.

IT IS SO ORDERED.

Floyd A. Wisner, Nolan Law Group, Chicago, IL, Susan Ruth Swanson, Portland, OR, for Plaintiff.

Alan D. Reitzfeld, James V. Marks, Holland & Knight, LLP, New York City, Jonathan M. Hoffman, Martin Bischoff, LLP, Portland, OR, for Defendant.

## ORDER

ROBERT E. JONES, District Judge.

Magistrate Judge John Jelderks filed Findings and Recommendation on April 30, 2001, in the above entitled case. The matter is now before me pursuant to 28

## FINDINGS AND RECOMMENDATION

JELDERKS, United States Magistrate Judge.

Plaintiff Joyce Coyle (Coyle) brings this action as Personal Representative of the Estates of Fritz G. Baden and Djoeminah Baden (the Badens), who died in the 1997 crash of a passenger airliner in Indonesia. Defendant P.T. Garuda Indonesia, dba Garuda Indonesia Airlines (Garuda), is wholly owned by the government of Indonesia.[1] Garuda has moved to dismiss this action—or, in the alternative, for summary judgment—on the ground that (1) this court lacks subject matter jurisdiction under either the Warsaw Convention or the Foreign Sovereign Immunities

---

1. According to Garuda's website, "[s]ince the airline's inception in 1949, Garuda Indonesia has grown from a humble single-aircraft operation into the largest airline in the Southern Hemisphere operating a modern fleet of more than 60 aircraft. Garuda Indonesia's network now spans the globe linking over thirty-five destinations on five continents." http://www.garudausa.com/beyond.htm (Dec. 26, 2000).

Act, (2) this court lacks personal jurisdiction over Garuda, (3) Oregon is not a permissible venue, or (4) the doctrine of *forum non conveniens* requires that this action be prosecuted in Indonesia rather than in Oregon. For the reasons that follow, I recommend that Defendant's motion be denied in its entirety and the matter be set for trial in Oregon.

## BACKGROUND

The Badens were American citizens domiciled in Lake Oswego, Oregon. Their three surviving children also are American citizens, including their daughter, Plaintiff Coyle, who is a resident of Oregon. The Badens decided to visit Indonesia in September 1997. They bought tickets through a Portland travel agent, Astra World Express, Inc. (Astra), which was authorized to make reservations for many airlines, including Garuda.

The Badens' original itinerary was as follows:

| Date | Airline | Origin and Terminus |
|---|---|---|
| Sept. 6 | Alaska/Horizon | Portland to Seattle |
| Sept. 7 | Eva Airways | Seattle to Taipei |
| Sept. 8 | Eva or Garuda [2] | Taipei to Jakarta |
| Sept. 30 | Garuda | Jakarta to Singapore |
| Sept. 30 | Eva Airways | Singapore to Taipei |
| Sept. 30 | Eva Airways | Taipei to Seattle |
| Sept. 30 | Alaska/Horizon | Seattle to Portland |

After arriving in Indonesia, the Badens decided to modify their itinerary by adding an additional stop in Medan, Indonesia. They purchased round-trip tickets, in Jakarta, for a Garuda flight to Medan departing Jakarta on September 26. Although the precise date and time of their return flight to Jakarta was left "open," the Badens needed to be back in Jakarta in time to catch the Garuda flight to Singapore departing at 8:00 a.m. on September 30. However, their plane flew into the

side of a mountain while on approach to Medan, killing all 234 on board.

## DISCUSSION

### A. Applicability of Warsaw Convention

The Warsaw Convention is an international treaty that "creates a nearly irrefutable presumption of liability and provides a judicial forum for the injured traveler, but at a cost to the claimant of severely limiting the damages recoverable against the carrier." [3] Kreindler & Rodriguez, 1 AVIATION ACCIDENT LAW § 10.01 (2000). The threshold question is whether that treaty applies here. Usually, it is the airline that invokes the Warsaw Convention to limit its liability. The present case is somewhat atypical, because it is the Plaintiff who seeks to invoke the Warsaw Convention so that her claim may be heard in the courts of the United States instead of in Indonesia.

The Warsaw Convention has been interpreted in a manner that tends to provide an injured traveler (or the survivors) a forum in the traveler's home country. Article 28 of that Convention mandates that an action be filed in one of four permissible venues, among which is "the court at the place of destination." When a traveler purchases a round-trip ticket, the "destination" is usually deemed to be the ultimate destination of the journey, *i.e.*, the point of origin. 1 AVIATION ACCIDENT LAW § 10.06; *Gasca v. Empresa De Transporte Aero Del Peru*, 992 F.Supp. 1377, 1380 (S.D.Fl.1998) ("courts have consistently held that the destination of a round trip is always the point of origin, which is usually the passenger's home").

---

2. Plaintiff's brief states that this leg of the trip was on Garuda, but Plaintiff's Ex. A appears to show that this leg was on Eva Airways. The discrepancy is not material to my recommendation.

3. The present damage cap is $75,000 per passenger. Some airlines have voluntarily increased the liability limit to approximately $134,700, but Garuda has represented that it is not among them.

Ordinarily, there is but one "destination" for each passenger. Intermediate stops on a lengthy trip are usually construed as "agreed stopping places" that do not alter the eventual destination. *See In re Alleged Food Poisoning Incident,* 770 F.2d 3, 6–7 (2d Cir.1985) ("destination" for purposes of Warsaw Convention was Riyadh, Saudi Arabia, when traveler bought ticket to travel from Riyadh to Dharhan to London to Washington to New York City and back to Riyadh); *Gasca,* 992 F.Supp. at 1380.

██ The final destination of the passenger, not of the plane, is what matters. *See Sopcak v. Northern Mountain Helicopter Service,* 52 F.3d 817, 818–19 (9th Cir.1995) (passenger's ultimate destination was Vancouver, British Columbia, notwithstanding that leg of flight that crashed was going no farther than Wrangell, Alaska); *Compania Mexicana De Aviacion, S.A. v. United States District Court,* 859 F.2d 1354 (9th Cir.1988) ("destination" of these particular passengers was Mexico, notwithstanding that plane which crashed on takeoff had been scheduled to continue on to Los Angeles after making stops within Mexico).

██ It is of little significance that legs of the trip are booked on more than one carrier. Under Article 1 of the Convention, transportation to be performed by several successive air carriers remains "one undivided transportation" so long as "it has been regarded by the parties as a single operation." *See Alleged Food Poisoning,* 770 F.2d at 6 (trip on multiple airlines); *Vergara v. Aeroflot,* 390 F.Supp. 1266 (D.Neb.1975) (legs of round-the-world trip booked on at least eight different airlines constituted "one undivided transportation").

██ A trip may be subject to the Warsaw Convention notwithstanding that it includes long lay-overs, is spread over the course of weeks or even months, or the precise dates and carriers for some legs

have not been finalized. *See Vergara,* 390 F.Supp. 1266 (round-the-world trip beginning in June and ending in late July or August, with long lay-overs in many cities, and the dates and carriers for the final six legs were left "open"); *Swaminathan v. Swiss Air Transport Co., Ltd.,* 962 F.2d 387, 389 (5th Cir.1992) (Senegal was final destination of passenger who purchased round-trip ticket from Senegal to New York, notwithstanding date of return to Senegal had been left open).

In *Haldimann v. Delta Airlines, Inc.,* 168 F.3d 1324 (D.C.Cir.1999), the passenger was scheduled to fly from Geneva, Switzerland to Washington, DC on June 19. A week later, she was to fly—on a different airline—from Washington to Pensacola, Florida, to visit her parents, then on to Gainesville, Florida, to attend a seminar, and then back to Washington in time to catch a return flight to Geneva on July 15. She was injured during the Pensacola to Gainesville leg. The DC Circuit held that the entire trip, including the domestic legs, was a single trip for purposes of the Warsaw Convention, hence her "destination" was Geneva rather than Gainesville or Washington. The Pensacola to Gainesville leg was "international transportation" even though it was a purely domestic flight within the borders of a single state. *Id.*

██ In light of the preceding authorities, it is clear that the Badens' trip to Indonesia was "international transportation" subject to the Warsaw Convention, with Portland, Oregon, being the Badens' ultimate "destination." It also is clear that if the fatal flight from Jakarta to Medan had been part of the Badens' original itinerary, Medan would be an "agreed stopping point" and the Warsaw Convention would apply.

The critical question is whether the outcome should be different because the Badens purchased the Jakarta to Medan tick-

ets after arriving in Indonesia, instead of including that leg of their journey in the original itinerary. Under the circumstances of this case, I do not believe that fact is sufficient to warrant a different result and deprive the Badens of the protections afforded to international travelers by the Warsaw Convention.

In *Gasca,* the decedent embarked on a business trip which contemplated his flying from Miami to Sao Paulo, Brazil; then to Uberaba, Brazil; back to Sao Paulo; then to Buenos Aires, Argentina; then to Santiago, Chile; and finally back to Miami. *Id.,* 992 F.Supp. at 1379. During the trip, he added two side trips to his schedule, including a day trip from Santiago, Chile to Lima, Peru, on Aero Peru. The additional round-trip ticket for that leg was purchased in Chile. His return flight from Lima to Santiago crashed in Peru. A lawsuit was later filed in Miami. The court held that the Warsaw Convention was applicable, and that Miami was the intended final destination.

Garuda correctly notes that the Lima to Santiago flight was itself an international flight, hence the Warsaw Convention would be applicable anyway. However, if that had been the sole basis for the court's decision, then the "destination" of that flight would have been Santiago, Chile, and the action could not have been maintained in Miami. Rather, the *Gasca* court concluded that the original itinerary was modified *en route* to add additional stopping points utilizing another air carrier. That the tickets were issued on different days and in different countries was not dispositive. *Id.* at 1381. The court also noted that all concerned, including the decedent, the agent who sold the original tickets, and the travel agent who sold the later ticket, were aware that he was eventually continuing on to Miami. *Id.* at 1382. "Finding that [he] was destined to return to Miami comports with common sense, with the Convention's desire to provide a passenger a forum in his or her home jurisdiction, and with the outcome in cases presenting similar factual scenarios." *Id.*

A similar result was reached in *Vergara,* 390 F.Supp. 1266. The Vergaras were on a round-the-world trip involving 17 stops, on at least eight carriers, over the course of over a month. Their flight from Uzbekhistan to Afghanistan was cancelled due to a revolution, so they took a flight from Uzbekhistan to Pakistan on Aeroflot. However, Aeroflot allegedly neglected to obtain permission to enter Pakistani air space, and the passengers were arrested upon their arrival in Karachi. Although the Vergaras had booked this flight at the last minute while in Uzbekhistan—and the rest of their trip had been booked and the tickets issued in Nebraska—the court held that the Warsaw Convention applied and that their "destination" was Nebraska. 390 F.Supp. at 1269.

Again, Garuda correctly observes that the Uzbekhistan to Pakistan leg was itself an international flight. However, if that had been the sole basis for the court's decision, then the "destination" would have been Pakistan and venue would not have been proper in Nebraska. The court also noted that Aeroflot handled some other legs of the Vergaras' trip (e.g., Berlin to Leningrad) and thus had notice that their final destination was Nebraska. *Id.* Finally, the court observed that, for a variety of reasons, itineraries must often be changed; "an airline ticket constitutes a highly modifiable contract." *Id.*[4]

4. *Accord Boyar v. Korean Air Lines,* 664 F.Supp. 1481, 1485 (D.D.C.1987) (ordinarily, when a passenger decides to take a flight that in some way differs from the passenger ticket originally issued to her, the parties are deemed to have modified the original contract rather than entering into a wholly new contract).

As in *Gasca*, the Badens decided to add an additional stopping point to their trip. Instead of staying in Jakarta, they decided to continue on to Medan, then fly back to Jakarta (on Garuda) to connect with their Garuda flight to Singapore, on their way back to Oregon. Clearly the Badens' ultimate destination was Oregon; there is no evidence they planned to remain in Indonesia. Garuda also knew that the Badens' ultimate destination was Oregon, because the Badens' flight out of Indonesia was booked on Garuda.[5] *Cf. Vergara*, 390 F.Supp. 1266 (Aeroflot had handled earlier legs of the flight and was aware of the Vergaras' ultimate destination).

Garuda also is charged with knowledge of the facts known to its agent in Oregon, Astra, which booked the Badens' trip and knew that they intended to return to Oregon. *See Gasca*, 992 F.Supp. at 1382, n. 3; *Lam v. Aeroflot Russian Int'l Airlines*, 999 F.Supp. 728, 731 (S.D.N.Y.1998) (Aeroflot's agent in Hong Kong must have been aware that passenger's stop there was but one segment of a larger journey).

Though not essential to my recommendation, I also note that if the Badens were required to show identification when purchasing their tickets or when boarding the flight to Medan—and Garuda's Station Manual indicates that identification must be examined in the latter instance[6]—it would have immediately been apparent that the Badens resided in the United States. *Cf. Lam*, 999 F.Supp. at 731 (if airline officials in Hong Kong checked passenger's passport and visa before boarding, as required, they would have been on notice that passenger was from the United States and not from Hong Kong).

In addition, as a practical matter, because this trip to Medan was scheduled so close to the Badens' departure date from Indonesia[7], and their return flight from Medan was "open," the Badens almost certainly would have mentioned their outbound flight to the Garuda agent to confirm that they could get back to Jakarta in time to make their connecting flight. It is improbable that the Badens would have risked being stranded in Medan that close to their departure date.

I reject Garuda's contention that the Warsaw Convention is inapplicable unless the tickets were all purchased at the same time and place. *Cf. Gasca*, 992 F.Supp. 1377 (original tickets purchased in Miami, additional tickets bought in Chile); *Vergara*, 390 F.Supp. 1266 (original tickets purchased in Nebraska, additional tickets bought in Uzbekhistan); *Lam*, 999 F.Supp. 728 (most of the tickets were purchased in Denver, but the tickets for one leg were purchased through an agent in Hong Kong).[8]

Garuda also argues that "the Garuda ticket stock" for flights between Jakarta and Medan is marked "IN A DOMESTIK," indicating that the ticket is for domestic travel. However, the fact that— from the airline's perspective—the flight was domestic is of little significance. In

---

5. Their flight in to Indonesia may also have been on Garuda, but the record is not clear on that point.

6. As any experienced international traveler knows, tourists frequently are required to show identification while traveling.

7. The ticket to Medan was issued on September 25, the flight to Medan was on September 26, and the Badens were scheduled to depart Indonesia at 8:00 am on September 30.

8. Reliance upon tickets, or the place where the ticket was "issued," becomes increasingly problematic as airlines adopt "ticketless" travel in which transactions are handled electronically and reservations can be made or modified *en route, e.g.,* by a traveler logging onto the Internet through a laptop computer, or placing a wireless call while in flight.

*Haldimann,* the plaintiff was injured while on a purely "domestic" flight between two cities in the same state. That did not preclude the airline from invoking the Warsaw Convention on the ground that— for this particular passenger—the domestic flight was one leg of an international journey. Similarly, the first leg of the Badens' trip to Indonesia was a "domestic" flight from Portland to Seattle on a regional commuter airline, but the Warsaw Convention would have applied if the Badens had been injured during that flight.[9]

Garuda also fails to explain the significance of the "Domestik" label. It may signal only that the flight begins and ends within Indonesia, hence the passengers are not subject to immigration and customs inspection. There also is no evidence that the Badens were aware of this label or of any special meaning that Garuda attributes to it. *Cf. Lam,* 999 F.Supp. at 733, n. 2 (no evidence that passenger was aware of notation or its significance). Nor is there anything in the record to show that foreign tourists were forbidden to take this flight.[10]

Sometimes, as in *Haldimann,* the Warsaw Convention bestows a windfall on the airline, capping its liability to an "international" passenger injured on a purely domestic flight. On other occasions, the Warsaw Convention protects international travelers by permitting survivors to file an action in the passenger's home forum instead of the situs of the accident, halfway around the world. This "trade-off" "enables international travelers to secure the benefits of the treaty regime even for segments of international transportation that are wholly within the territory of a signatory with a tort system far narrower than that of the treaty." *Haldimann,* 168 F.3d at 1324.

I conclude that the Warsaw Convention governs this case, and that the Badens' "destination," for purposes of that treaty, was Portland, Oregon.

**B. *Foreign Sovereign Immunities Act***

■ Garuda contends that, because Garuda is owned by the government of Indonesia, this action is barred by the Foreign Sovereign Immunities Act (FSIA), 28 USC § 1602, *et seq.* I disagree. 28 USC § 1605(a) provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver * * *

---

9. I do not suggest that the domestic character of a flight is never significant. Had the Badens decided to take a sight-seeing helicopter ride around the city, operated by a local company, it is doubtful that the Warsaw Convention would apply. The flight in question here was a regularly scheduled passenger flight, operated by the same airline on which the Badens had booked their return flight out of Indonesia.

10. *Karfunkel v. Compagnie Nationale Air France,* 427 F.Supp. 971 (S.D.N.Y.1977), *abrogated on other grounds by Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 111 S.Ct. 1489,

113 L.Ed.2d 569 (1991), is readily distinguishable. In *Karfunkel,* the plaintiffs purchased one way "student" tickets from Tel Aviv to Paris. The defendant airline, and the agent who sold the tickets, were both unaware that the plaintiffs intended to continue on to New York on another airline. The court also hinted that the plaintiffs had misled the defendant regarding their intentions (and/or student status) in order to take advantage of a fare to which they were not entitled. The court held that their "destination" was Paris, and New York was not a permissible forum. The facts here are very different.

On August 15, 1988, Garuda obtained a permit from the United States Department of Transportation authorizing Garuda to operate passenger flights between Indonesia and the United States. The permit was conditioned upon a limited waiver of sovereign immunity:

> (3) The holder agrees that operations under this permit constitute a waiver of sovereign immunity for the purposes of 28 USC § 1605(a), but only with respect to those actions or proceedings instituted against it in any Court or Tribunal in the United States that are:
>
> > (a) Based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States; or;
> >
> > (b) Based on a claim under any international agreement or treaty cognizable in any Court or other Tribunal of the United States.
>
> In this condition, the term "international air transportation" means "international transportation" as defined by the Warsaw Convention, except that all States shall be considered to be High Contracting Parties for the purposes of this definition.

Since I have concluded that the Warsaw Convention applies to this action, it follows that this action is "[b]ased upon a claim under any international agreement or treaty cognizable in any Court or other Tribunal of the United States." Consequently, Garuda has waived sovereign immunity for purposes of this action.[11]

Although Garuda's direct flights to the United States ended in 1998, Garuda was still operating flights under this permit in September 1997, when the Badens were killed. The waiver remains in effect "notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 USC § 1605(a). Garuda has not argued that the waiver was withdrawn, much less that it was retroactively withdrawn "in accordance with the terms of the waiver."

I conclude that Garuda has waived any sovereign immunity defense with regard to this action.[12]

## C. *Personal Jurisdiction*

 Garuda contends it is not subject to personal jurisdiction in Oregon. Garuda does not point to any other location within

---

11. A waiver could also be established under paragraph 3(a) of the permit conditions. The provisions regarding "international air transportation" essentially mirror the provisions of the Warsaw Convention, hence it is appropriate to interpret them similarly. On its face, the waiver is not confined to Garuda flights that physically enter the United States, nor would such a limitation be consistent with the Warsaw Convention. Since this action is based on Garuda's "operations in international air transportation that ... include a point in the United States as a point of origin, point of destination ... or for which the contract of carriage was purchased in the United States," these claims are within the scope of the waiver.

12. In *Compania Mexicana*, 859 F.2d 1354, this Circuit held that similar language did not waive Mexico's sovereign immunity regarding the claims in that case. The critical distinction is that those claims were asserted on behalf of Mexican citizens killed in a crash, in Mexico, while on a domestic Mexican flight. It was not a domestic leg of an international trip (at least not for these particular passengers), so the Warsaw Convention was inapplicable. *Id.* at 1359. Rather, the plaintiffs were arguing that the waiver extended to all claims whatsoever made against the airline, a theory that the Circuit properly rejected.

the United States where it would be subject to suit but, instead, argues that this action must be brought in Indonesia. I disagree. Article 28(1) of the Warsaw Convention provides that:

An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

This is a forum selection clause, albeit one created by international treaty rather than by contract. *Cf. Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (enforcing forum selection clause in a form contract). Article 28(1) expressly grants the plaintiff discretion to choose from among several permissible forums.

Notably absent from the list of permissible forums are several places where personal jurisdiction traditionally would be proper, including the site of the accident, the place where the negligent act or omission occurred, and localities where the airline conducts systematic and continuous commercial activities. Consequently, the range of permissible forums is severely restricted.

A necessary implication of this restriction is that the airline consents to personal jurisdiction at those locations specified in Article 28(1). Otherwise, the permissible venues will often be restricted to one: the domicile of the carrier. Such a result would be contrary to the plain language of Article 28(1), which states that the action "must" be brought at one of the four enumerated locations "at the option of the plaintiff." Such a result also would undermine the "tradeoff" by which a traveler usually is afforded a forum in the traveler's home country in return for limiting the airline's liability.[13] An airline such as Garuda cannot benefit from the Warsaw Convention's liability and venue limitations when convenient, while disclaiming other less favorable provisions of the Convention.

Furthermore, any airline that is cognizant of the Warsaw Convention must anticipate being haled into court at the place of a passenger's final destination, as specified in Article 28(1).

Although I conclude that Garuda is subject to personal jurisdiction in the four locations specified in Article 28(1), that does not necessarily mean that trial must be in Oregon. Most of the courts that have considered this question have concluded that Article 28(1) is concerned with jurisdiction only at the national level, *i.e.,* in which countries the action may be brought. Domestic law must then be applied to determine the proper venue within a particular country. *See, e.g., Mertens v.*

**13.** I decline Garuda's invitation to follow *Luna v. Compania Panamena De Aviacion, S.A.,* 851 F.Supp. 826 (S.D.Tex.1994). In *Luna,* a Texas resident purchased, in Texas, a round trip ticket for a trip from Texas to Columbia, with a change of planes (and airlines) in Panama. She was killed in a crash on the Panama to Columbia leg of the trip. The action was subject to the Warsaw Convention, and her final "destination" was Texas. Nevertheless, the district court dismissed the action, reasoning that the accident occurred in Panama, the negligence that caused the accident occurred in Panama, and the airline operating that leg of her trip did not fly to Texas. *Id.* at 832–34. The court inferred that the action had to be brought in Panama, a country with which the passenger had no connection other than the fortuity that she was obliged to stop there to change planes.

The Warsaw Convention is structured to avoid such a scenario. That is why flights on successive carriers are usually regarded as a single undivided trip, and the "destination" of a round trip is also its point of origin.

*Flying Tiger Line, Inc.*, 341 F.2d 851, 855 (2d Cir.1965), *disapproved on other grounds by Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 127, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *Welch v. American Airlines, Inc.*, 970 F.Supp. 85, 86 (D.P.R. 1997).

■ Consequently, Article 28(1) of the Convention tells us only that the United States as a whole is a proper forum for this action. Garuda's concerns regarding whether Oregon has a sufficient nexus to this case, or is an inconvenient forum, can be adequately addressed in the context of determining the proper forum within the United States. The doctrine of *forum non conveniens* also remains available to Garuda. *See Trivelloni–Lorenzi v. Pan American World Airways, Inc.*, 821 F.2d 1147, 1160–62 (5th Cir.1987) (en banc).

Additionally, 28 USC § 1330(b) provides that:

Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under [28 USC § 1330(a) ] where service has been made under section 1608 of this title.

Section 1608 is the service provision of the FSIA. Section 1330(a) confers original jurisdiction over actions against a foreign state "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under either sections 1605–1607 of this title or under any applicable international agreement." Thus, § 1330(b) confirms that this court may exercise personal jurisdiction over Garuda unless the exercise of jurisdiction would be so unreasonable as to constitute a violation of Garuda's due process rights (which is addressed below).

Although I do not believe it is necessary to engage in a minimum contacts analysis, the result would be the same. There is evidence in the record from which a court could find that (1) at least 426 travel agents in Oregon are authorized to sell tickets on behalf of Garuda, and are paid a commission for such sales, (2) those agents sold approximately 72 tickets for Garuda during an 18–month period; (3) the Badens purchased the original tickets for their trip to Indonesia (including an international leg on Garuda) through such a travel agent in Oregon, who received a commission from Garuda, and (4) Garuda furnishes brochures and other promotional materials to travel agents in Oregon to induce the sale of tickets to Oregon residents. *Cf. Shute v. Carnival Cruise Lines*, 897 F.2d 377, 379, 381–86 (9th Cir.1990) (cruise ship operator's contacts with Washington sufficient to support jurisdiction), *rev'd on other grounds*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Gullett v. Qantas Airways, Ltd.*, 417 F.Supp. 490, 495–97 (M.D.Tenn.1975) (jurisdiction over Australian airline was proper in Tennessee). There is also some evidence that a Garuda representative visited Oregon to promote ticket sales, though Garuda disputes that assertion.

In addition to its contacts with Oregon, Garuda has contacts with the United States as a whole. In 1997, when the fatal accident occurred, Garuda was operating passenger service between Indonesia and the United States. There is evidence from which a court could find that Garuda established, in the United States, a network of sales offices, 800 numbers, web sites, and authorized travel agents, and also advertised in certain publications distributed nationally, all aimed at promoting ticket sales in this country. Garuda also negotiated a "code-sharing" agreement with Northwest Airlines, as part of Garuda's plan for extending service to Seattle, Detroit, Minneapolis, Memphis, and San Francisco. Most of the sales offices were closed after Garuda suspended flights to the United States in 1998, but Garuda still has a Los Angeles office, and its 800 num-

ber, web sites, and network of authorized travel agents in the United States.

In the past, a defendant could have a variety of contacts with the United States, yet lack sufficient contacts with any one state to permit the exercise of jurisdiction. In 1993, Congress closed this "venue gap" by enacting FRCP 4(k)(2), which provides that:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons ... is effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Garuda does not contend that it is subject to jurisdiction in a state other than Oregon. Quite the contrary, Garuda has argued that it is subject to jurisdiction only in Indonesia. I also am satisfied that the claims in this action arise under federal law.[14] Accordingly, even if Garuda's contacts with Oregon alone are insufficient, FRCP 4(k)(2) authorizes this court to exercise jurisdiction because Garuda's contacts with the United States, in the aggregate, are sufficient to satisfy the minimum constitutional requirements.

Of course, even when a defendant has sufficient contacts to justify the exercise of jurisdiction, due process requires that the exercise of jurisdiction be reasonable. *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1198 (9th Cir.1988). Among the factors to be considered are "the extent of purposeful interjection; the burden on the defendant; the extent of conflict with sovereignty of the defendant's state; the forum state's interest in adjudicating the suit; the most efficient judicial resolution of the dispute; the convenience and effectiveness of relief for the plaintiff; and the existence of an alternative forum." *Id.* at 1198–99.

Oregon has a strong interest in providing a forum for Plaintiff Coyle, an Oregon resident seeking to recover for the wrongful death of her parents, who also were Oregon residents. *See Shute,* 897 F.2d at 387 (a state has a strong interest in protecting its citizens against the tortious acts

---

**14.** Until recently, the rule in this Circuit was that the Warsaw Convention creates an independent federal cause of action. *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 412 (9th Cir.1983). In *Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 229, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), the Supreme Court declared that Articles 17 and 24(2) of the Warsaw Convention "provide nothing more than a pass-through, authorizing us to apply the law that would govern in absence of the Warsaw Convention." Although that statement could suggest that such claims arise entirely under state law, it is difficult to reconcile such a theory with the damage caps established by the Convention (both as to the amount of damages and also the kinds of injuries that are compensable, *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)), or with the rule that the Warsaw Convention preempts state law claims. By using the term "pass-through," the Supreme Court probably meant that the trial court borrows, from applicable domestic or foreign law, certain elements of the claim, *e.g.,* "who may bring suit and what they may be compensated for." *Id.* at 225, 116 S.Ct. 629. A familiar example is an action under 42 USC § 1983. Although the claim arises under federal law, a federal court "borrows" the applicable state statute of limitations for torts, which may differ from state to state. *See Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). This interpretation is buttressed by *El Al Israel Airlines, Ltd.,* 525 U.S. 155, 169–70, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999), which held that the Warsaw Convention preempts local law on the question of "whether there is liability" even though it borrows local law regarding certain "auxiliary issues" pertaining to damages. I conclude that, *Zicherman* notwithstanding, an action under the Warsaw Convention "aris[es] under federal law" for purposes of FRCP 4(k)(2).

of others, even if the injury occurs outside the state). The only alternative forum proposed by Garuda is Indonesia, but I am unable to determine, from the existing record, whether Coyle would have an adequate remedy in Indonesia. As a practical matter, it may not be cost-effective for Coyle to pursue this action in Indonesia in light of the damage caps imposed by the Warsaw Convention.

Garuda may find it somewhat burdensome to litigate in the United States, but certainly no more burdensome than it would be for Coyle to litigate this action in Indonesia. As an international airline with strong ties to the government of Indonesia, Garuda has the experience and resources to effectively participate in international legal proceedings and business affairs,[15] particularly when compared to Plaintiff Coyle.

As for the choice of forums within the United States, Oregon is situated on the Pacific rim, and the federal court in Portland is readily accessible by air from most major cities.[16] There is no evidence that it would be particularly burdensome for Garuda to defend in Oregon, as opposed to defending in another state, or that Plaintiff selected Oregon as the forum for an improper purpose.

Judicial efficiency would not suffer by trying the case in Oregon. In comparison to some other jurisdictions, Oregon's civil docket moves rather quickly. Even assuming, *arguendo*, that Indonesian substantive law applies, jury instructions are not an issue because an action against a foreign sovereign is tried to the court. *See* 28 USC § 1330(a); *Gould v. Aerospatiale Helicopter Corp.*, 40 F.3d 1033, 1034–35 (9th Cir.1994).

The factor of conflict with the sovereignty of the defendant's state, while meriting careful consideration, "is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." *Sinatra*, 854 F.2d at 1199, quoting *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir.1984). Here, sovereignty concerns are, to a considerable degree, addressed by the Warsaw Convention, which specifies the forums, limits liability, and establishes uniform liability rules that transcend national borders, *see El Al Airlines*, 525 U.S. at 169–70, 119 S.Ct. 662, and by the FSIA, which establishes rules that govern claims against a foreign government even when, as here, sovereign immunity has been waived.

A final factor is the extent of purposeful interjection into the forum. That is somewhat less of a consideration here, where the permissible forums are specified by treaty. While an airline does not select its passengers, per se, Garuda did elect to act as a common carrier transporting passengers on international trips; Garuda made arrangements with travel agents in Oregon to sell tickets on its behalf and reaped the benefit of those ticket sales; Garuda's agent in Oregon sold the Badens tickets for their journey to Indonesia (which was subsequently extended to add the additional agreed stop in Medan); and, until recently, Garuda operated flights to the United States and actively solicited customers in the United States.

After considering all the circumstances, I conclude that requiring Garuda to defend this action in the United States, and in Oregon in particular, does not violate Ga-

---

**15.** I note that Garuda successfully navigated the regulatory shoals and obtained the right to operate international commercial passenger flights to the United States, which is no small feat.

**16.** At oral argument, the parties were very ably represented by their counsel from Chicago and New York, respectively.

ruda's due process rights under the Fifth Amendment.

## D. *Venue*

■ Garuda moves to dismiss this action on the ground that venue is not proper in Oregon. 28 USC § 1391(f) provides that:

A civil action against a foreign state as defined in section 1603(a) of this title may be brought—

(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

Venue statutes ensure that an action is tried in a forum having some connection to the events at issue. *See Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir.1994) (venue statute protects the defendant from being "haled into a remote district having no real relationship to the dispute.") Venue is proper under § 1391(f)(1) if a "substantial part" of the events or omissions occurred in this district. The statute does not require that a majority of the events take place here, nor

that the Oregon be the "best" forum or have the most substantial contacts. *Id.* (construing parallel language in 28 USC § 1391(a)). *See also Park Inn Int'l, LLC v. Mody Enterprises, Inc.*, 105 F Supp.2d 370, 376 (D.N.J.2000); *Neufeld v. Neufeld*, 910 F.Supp. 977, 986 (S.D.N.Y.1996).

Oregon is the only state with a close connection to the events at issue. The Badens were residents of Oregon, as is Plaintiff Coyle. The fatal trip departed from Oregon, and was the Baden's intended final destination. The Badens purchased tickets for their trip to Indonesia in Oregon, from an Oregon travel agent acting as Garuda's agent. I also note that, although the crash and the alleged negligence both occurred in Indonesia, Article 28(1) of the Warsaw Convention does not include either location among the list of permissible forums. However, the United States, as the final "destination," is a permissible forum, and Oregon is the district within the United States with the closest relationship to this action.

Even assuming, *arguendo*, that venue is not proper in Oregon, Garuda would not be entitled to have this action dismissed. Instead, in accordance with 28 USC § 1406(a), this action would simply be transferred to the District of Columbia, which also is a permissible venue by virtue of 28 USC § 1391(f)(4).[17]

## E. *Forum non conveniens*

Garuda contends that this action must be dismissed under the doctrine of *forum non conveniens.*

■ "[A] plaintiff's choice of forum should rarely be disturbed. However, when an alternative forum has jurisdiction

**17.** For the reasons previously discussed, personal jurisdiction is proper in the United States, so—if venue and jurisdiction are not proper in Oregon—then they would be proper in the District of Columbia. *See* FRCP 4(k)(2); 28 USC § 1330(b); 28 USC § 1391(f)(4).

to hear the case, and when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), *quoting Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). "To guide trial court discretion, the [Supreme] Court has provided a list of 'private interest factors' affecting the convenience of the litigants, and a list of 'public interest factors' affecting the convenience of the forum." *Piper Aircraft,* 454 U.S. at 241, 102 S.Ct. 252, *quoting Gulf Oil v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

The factors pertaining to the private interests of the litigants include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. The public factors bearing on the question include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft,* 454 U.S. at 241, n. 6, 102 S.Ct. 252.

Garuda, as the moving party, bears the burden of establishing "the existence of an adequate alternative forum and that private and public interest factors favor dismissal." *Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd.,* 918 F.2d 1446, 1449 (9th Cir.1990). In carrying this burden, Garuda "must provide sufficient information to enable the district court to balance the parties' interests." *Id.* Although an American citizen has no absolute right to sue in a United States court, "a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown." *Id.*

At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an adequate alternative forum. *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991). The standard is not a very high one. A foreign forum is not inadequate simply because the damage award will not be as great, or the identical cause of action is not available, or even because of differences in procedure as compared to a court in the United States. *See Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1143–45 (9th Cir. 2001) (New Zealand's no-fault accident compensation system provided an adequate alternative); *PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 74 (2d Cir.1998) (although RICO claim was not cognizable in proposed alternative forum, the plaintiff could bring an action for fraud; issue was whether plaintiff had an adequate, not identical, remedy); *Lockman,* 930 F.2d at 768 (forum adequate despite having no right to a jury trial). Considerations of comity also tend to discourage a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards. *PT United Can,* 138 F.3d at 73.

Although FRCP 44.1 allows a court to ascertain foreign law through various means, including its own research, "expert testimony accompanied by extracts from foreign legal materials has been and will likely continue to be the basic mode of proving foreign law." *Universe Sales Company, Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir.1999).

██ Unfortunately, Garuda has provided no evidence from which this court can determine whether Indonesia is an adequate alternative forum. *Cf. Gemini Capital Group, Inc. v. Yap Fishing Corp.*, 150 F.3d 1088, 1092 (9th Cir.1998) (moving party "provided the district court with a wealth of primary authority, covering both substantive and procedural law," establishing that Yap was an adequate alternative forum); *Lockman*, 930 F.2d at 768 (moving party furnished expert affidavits explaining relevant aspects of Japanese substantive and procedural law).

Garuda cites two published opinions in which Indonesia was found to be an adequate alternative forum, but that is insufficient to sustain Garuda's burden of proof. The parties to this action are not bound by the decisions in those other cases, and the types of claims are dissimilar. A country may provide an adequate remedy for certain types of injuries or parties, but no remedy at all for other injuries or parties. Plaintiff also expresses concern regarding recent events in Indonesia which suggest that circumstances may be different than when the cited cases were litigated.

I do not conclude that Indonesia is an inadequate alternative forum, but only that, on this record, Garuda has not carried its burden of showing that Indonesia is an adequate alternative forum for this action. *See Contact Lumber*, 918 F.2d at 1449 (moving party has burden of proof).[18]

Turning to the private factors, my analysis is again dependent on a limited record. The facts surrounding the accident (as distinguished from the conclusions to be drawn from those facts) do not appear to be seriously disputed. It also does not appear that many witnesses will be required. Garuda's response to Interrogatory No. 9 identifies only one witness residing outside the United States whose testimony is "necessary" to Garuda's defense. Garuda subsequently identified several additional persons "involved in the investigation," though it is unclear if their testimony is required, or how much of that testimony would be redundant. I also question whether all of these individuals need to be physically present in the courtroom. Video conferencing technology, depositions, and other techniques may suffice, particularly in a court trial.

In its reply brief, Garuda also points to three other possible witnesses, but they have no knowledge regarding the accident. Rather, Garuda wants to use their testimony to buttress its contention that this action is not subject to the Warsaw Convention, but that issue will have been resolved prior to any trial on the merits. Plaintiff has not yet identified her witnesses, but it is likely that some, including experts, may be from the United States or countries other than Indonesia.

Garuda also represents that most of the documents relevant to this case are located

---

**18.** In a footnote in its reply brief, Garuda requests leave "to submit evidence as to the elements and procedures of Indonesian law if the Court believes that such evidence would be helpful to a determination of the Motion." As a procedural matter, evidence required to support a motion should be submitted with the motion. As a practical matter, Garuda's motion to dismiss for *forum non conveniens* would fail even if I concluded that Indonesia is an adequate alternative forum. Therefore, I will not require the parties to supplement the record.

**1176**

in Indonesia, but furnishes no details regarding the quantity of documents or the feasibility of copying and transporting them, which makes it difficult to evaluate Garuda's conclusory assertions of inconvenience.

Ordinarily, the fact that witnesses and documents are located in Indonesia would weigh in favor of that forum, because the local court can compel attendance of witnesses and production of documents. However, there apparently "are no provisions by which Indonesian courts can compel the production of witnesses or documents, *either for the purposes of their own proceedings or in support of trials before foreign courts.*" *PT United Can Company, Ltd. v. Crown Cork & Seal Company, Inc.,* 1997 WL 31194 (S.D.N.Y.1997) (emphasis added).[19] Consequently, there is no assurance that these witnesses or documents will be available even if trial is held in Indonesia.

Transporting witnesses and documents is not an insignificant task, but Garuda—as an international airline—is better equipped to meet that challenge than is the average litigant. Garuda also argues that the cost to fly witnesses to Oregon would be "exorbitant," but I am not persuaded, on this record, that the cost would be prohibitively high, particularly when compared to other costs involved in trying this case.

Some documents and testimony may need to be translated into English, but Coyle would require translation services if this action were litigated in Indonesia, as would any foreign witnesses. I am not aware of any premises to be viewed, or other reason why the finder of fact must be present in Indonesia. Garuda has not shown any reason why the court would need to view the wreckage, if it still exists.[20]

Unlike some airline crashes, the court is not aware of any cases pending in another jurisdiction with which the present action should be consolidated, nor does it appear that the same issues will be litigated in multiple jurisdictions. Garuda has advised the court that almost all of the other claims arising from this crash have been settled.

With regard to the public interest factors, the docket in this district moves rather quickly compared to many other jurisdictions. There is little danger that Oregon will be swamped by a tide of similar cases. Garuda has not pointed to any special expertise that an Indonesian court may possess in resolving cases of this sort. *Cf. Gemini Capital,* 150 F.3d at 1094–95 (Yap court had more experience with particular type of litigation than any other court in the United States).

Trial will be to the court, so jury duty will not be imposed on the community, nor will it be necessary to craft jury instructions on Indonesian law even assuming, as Garuda contends, it is applicable to this case.[21] In addition, at least part of the

---

**19.** The *PT United Can* court did note that "a party failing to cooperate during discovery can have its case dismissed," but it is unclear what sanctions would be imposed upon a defendant (or upon the government of Indonesia, which owns Garuda). In any event, such a sanction is of little use to compel the production of documents or witnesses outside the control of the parties.

**20.** "At least some of the aircraft wreckage" has been "disposed of," and it is unclear what portions, if any, remain.

**21.** Although a few Ninth Circuit cases have suggested that the district court "must" make a choice of law determination as part of its analysis of the *forum non conveniens* issue, subsequent decisions have limited this to circumstances in which the court intends to grant the motion, or "when the case involves a United States statute requiring venue in the United States, such as the Jones Act or the Federal Employers' Liability Act." *Lueck,* 236 F.3d at 1148. Neither circumstance is applicable here.

substantive law will be supplied by the Warsaw Convention rather than by domestic law. *See El Al Israel Airlines,* 525 U.S. at 170, 119 S.Ct. 662. In any event, the judges in this district are fully capable of applying foreign law. *Cf. Byron v. Rajneesh Foundation Int'l,* 634 F.Supp. 489 (D.Or.1985) (applying the law of India).

Finally, Indonesia has a strong interest in the matter, since the crash occurred in Indonesia, the plane was operated by an Indonesian airline, and many Indonesian citizens died in the crash. However, the court is advised that the claims of the Indonesian residents have already been resolved, and the government of Indonesia has conducted its own investigation and has (or will soon) issue its report. This trial, involving two U.S. citizens, is of lesser local interest.

Oregon has a strong interest in this matter, which distinguishes this case from most cases in which the courts have granted a motion to dismiss for *forum non conveniens. Cf. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (Virginia resident seeking to recover, in New York, against a Pennsylvania corporation amenable to suit in Virginia for damages to a Virginia warehouse); *Piper Aircraft,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (estates of Scottish passengers killed in plane crash in Scotland seeking to recover damages in Pennsylvania); *Lueck,* 236 F.3d 1137 (New Zealand citizens seeking to recover in Arizona for injuries sustained in a plane crash in New Zealand); *Creative Technology, Ltd. v. Aztech System Pte, Ltd.,* 61 F.3d 696, 704 (9th Cir.1995) (two Singapore corporations seeking to litigate their intellectual property dispute in a California court).

I find that Garuda has not met its burden of showing that Indonesia is an adequate alternative forum, or that the private and public factors tip strongly in favor of trying this case in Indonesia.

At best, the burdens would simply be shifted from Garuda to Coyle, and one set of problems exchanged for another. Trial in Oregon would not result in "oppressiveness and vexation to [Garuda] out of all proportion to plaintiff's convenience." *Koster,* 330 U.S. at 524, 67 S.Ct. 828.

In summary, I conclude that this action is governed by the Warsaw Convention; that Portland, Oregon, was the Badens' "destination" for purposes of Article 28(1); that Garuda waived its sovereign immunity as to the claims in this action; that this court has subject matter jurisdiction and also has personal jurisdiction over Garuda; that venue is proper in Oregon; and that Garuda has not shown sufficient cause to dismiss this action on the ground of *forum non conveniens.*

## CONCLUSION

I recommend that Defendant's Motion (# 16) to Dismiss, or in the alternative, for Summary Judgment, be DENIED and this matter be set for trial in Oregon.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due May 17, 2001. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.